UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

JULIA BONNEWITZ,

        **Plaintiff,**

  v.

Case No.:_____

**BAYLOR UNIVERSITY**
**Board of Regents,**

        **Defendant.**

## COMPLAINT AND DEMAND FOR JURY TRIAL

## PRELIMINARY STATEMENT

1. PLAINTIFF JULIA BONNEWITZ was a junior at Baylor University when the Director of Baylor's Tennis program and the Head Men's Tennis Coach, Brian Boland, attempted to groom her for what she perceived as an inappropriate relationship during the Spring Semester 2020.

2. Following a cursory internal Title IX investigation at Baylor, Boland resigned on July 29, 2020.

3. Ms. Bonnewitz complained to Baylor about the way it conducted the Title IX investigation and for failing to keep the investigation, including the underlying facts of the Title IX investigation, confidential.

4. In August 2020, Ms. Bonnewitz, who at one time was a nationally ranked tennis player, met with Associate Vice President for Intercollegiate Athletics, Jeremiah Dickey, and

1

Senior Associate Athletics Director, Jovan Overshown, to discuss her wish to join the Baylor's Women's Tennis team. However, Baylor refused to allow Ms. Bonnewitz to try out in retaliation for participating in a Title IX investigation and in retaliation for complaining about discrimination.

5. Ms. Bonnewitz seeks to enforce her rights under Title IX of the Education Amendments of 1972, 20 U.S.C. §§1681, *et. seq.* and its implementing regulations.

## JURISDICTION AND VENUE

6. Jurisdiction of this Court is invoked pursuant to 8 U.S.C. §1331 (federal question).

7. Venue is proper pursuant to 28 U.S.C. § 1391(b).

## PARTIES

8. Plaintiff Julia Bonnewitz, at all relevant times, was a student attending Baylor University in Waco, Texas.

9. Ms. Bonnewitz is a resident of Orange County, Florida.

10. At all relevant times, Baylor University was a post secondary educational institution located in Waco, Texas. The Board of Regents, the official governing body of Baylor University, is charged with its governance and operation.

11. At all relevant times, Defendant was a federal funding recipient as defined by 28 U.S.C. § 1681.

## STATEMENT OF FACTS

12. Ms. Bonnewitz and Defendant Baylor University (hereinafter "Baylor" or "Defendant") began discussing Ms. Bonnewitz's prospect of playing tennis at Baylor in 2016.

13. Ms. Bonnewitz chose to enroll at Baylor based on her communications with Baylor even though Ms. Bonnewitz was a nationally ranked tennis player and turned down scholarship offers from other universities.

14. However, upon arrival at Baylor in 2017, the Women's Tennis coach back peddled, texting Ms. Bonnewitz that she could not join the tennis team and she could play club tennis instead.

15. Beginning in the Fall Semester 2019, Ms. Bonnewitz began practicing with Juan Benitez, a two time All American former Baylor tennis player and Men's Tennis Student Assistant Coach.

16. Ms. Bonnewitz encountered Boland when she was practicing with Benitez.

17. Boland told Ms. Bonnewitz that she should consider joining the Women's Tennis team.

18. On April 18, 2020, after many encounters and conversations with Boland, Ms. Bonnewitz reached out to Boland to ask for help joining the Women's Tennis team.

19. Boland responded he would need to think about what the best approach would be.

20. On May 20, 2020, Ms. Bonnewitz invited Boland to grab lunch to discuss how she could join the Women's Tennis team.

21. Boland messaged Ms. Bonnewitz after 11:00 p.m. to ask if she would like to go out for dinner and beers on him the following night instead.

22. Initially Ms. Bonnewitz did not know how to respond because she was worried about Boland's suggestion to meet for dinner and beers instead of lunch.

23. After no response from Ms. Bonnewitz, Boland quickly messaged her again saying that he would bring his wife.

24. In this moment, it eased Ms. Bonnewitz's concern that the messages were for legitimate purposes and she agreed to meet Boland and his wife for dinner the next night.

25. The next day, Boland cancelled their dinner plans and messaged Ms. Bonnewitz late that night starting at 11:34 p.m. asking if she was awake and asking to set up another time to meet.

26. Ms. Bonnewitz, thinking Boland's request was for legitimate purposes, responded to his message.

27. However, Ms. Bonnewitz quickly realized Boland was trying to engage her in an inappropriate relationship when he asked her to meet him at a bar past midnight and to not tell anyone about it.

28. When Ms. Bonnewitz did not respond, Boland bombarded her well into the next morning with a total of twelve consecutive messages trying to get her to meet up with him.

29. On or about June 10, 2020 Ms. Bonnewitz messaged Boland, writing him that his prior messages were inappropriate and unprofessional and that the messages made her uncomfortable. Ms. Bonnewitz also expressed that she was disappointed with the behavior of the Baylor tennis coaches.

30. Boland responded to Ms. Bonnewitz and wrote that he was so confused; that he didn't know what she was referring to; and requested that she call him.

31. Boland then tried to call Ms. Bonnewitz, but Ms. Bonnewitz declined his call.

32. Juan Benitez then contacted Ms. Bonnewitz claiming that Boland was scared; to delete the texts; not to do anything to harm Boland because Boland was like a father to him; and Boland would never cheat on his wife Becky.

33. Ms. Bonnewitz then messaged Boland and asked how Benitez was able to contact her and explain the situation if Boland didn't know what she was referring to and if he was so confused. Ms. Bonnewitz then wrote Boland to get his story straight before he made things worse for himself.

34. Boland's wife Becky then contacted Ms. Bonnewitz via voicemail message in attempt to smooth things over.

35. Becky Boland left a message stating that she knew what happened and that she and Boland were going to help Ms. Bonnewitz in any way they could. Becky Boland asked Ms. Bonnewitz to call her back so they could figure everything out.

36. Ms. Bonnewitz texted Becky Boland what she was not sure what there was to figure out because her husband lied; denied what happened; and got other people to cover up for him in order to portray himself as the victim. Ms. Bonnewitz then texted that she did not want to hear from Boland again except for him to acknowledge what happened and to apologize.

37. Boland then called Ms. Bonnewitz twice and left a text message for her to call him back.

38. Ms. Bonnewitz texted back writing that she had nothing more to say to Boland and if Boland wanted to acknowledge and apologize for his actions he could do it via text.

39. Boland then texted Ms. Bonnewitz apologizing and asking her to consider meeting with him to talk to him.

40. Ms. Bonnewitz did not respond.

41. Ms. Bonnewitz thought this was the end of the matter until Defendant contacted Ms. Bonnewitz on July 16, 2020 informing her that the Title IX office believed Ms. Bonnewitz might have additional information regarding an unidentified matter.

42. Ms. Bonnewitz inquired what the matter was concerning since Defendant did not let Ms. Bonnewitz know the investigation was about her.

43. When Defendant informed Ms. Bonnewitz that the Title IX investigation was about a student who received inappropriate text messages from a staff member, Ms. Bonnewitz cooperated and provided Baylor's Title IX office with the text messages.

44. Defendant turned the matter regarding Boland over to its human resources department but failed to investigate Juan Benitez for his involvement in the incident.

45. On July 29, 2020, Boland resigned.

46. Defendant's Athletic Director Mack Rhodes is quoted in the media on *MSN Sports* as stating "Brian Boland came to Baylor with a strong track record of success, and he made significant improvements in his two seasons leading the Baylor men's tennis program. While we're disappointed his time leading our program has come to an end, we are grateful for his effort over the past two years, and we wish the Boland family the best as they take their next step".

47. Upon information and belief, Defendant asked Boland to resign.

48. Other media outlets reported that Baylor asked Boland to resign because of text messages he sent to a student.

49. Ms. Bonnewitz became upset and complained to Defendant about the media leak and the way Defendant handled the confidentiality of the investigation.

50. Upon information and belief, Baylor tried to place the blame on Ms. Bonnewitz for leaking the story, but upon investigation it appeared the individual who reported Boland's misconduct (who was not Ms. Bonnewitz) leaked the story to the media.

51. Upon further information and belief, Baylor did not take action against the individual who leaked the story to the media even though Title IX investigations are supposed to remain confidential.

52. While Ms. Bonnewitz complained to Defendant about the way Defendant handled the Title IX investigation, Ms. Bonnewitz nonetheless informed Baylor that she wanted to move forward with her academic and athletic prospects at the university.

53. Prior to her participation in the Title IX investigation, Ms. Bonnewitz made clear to Brianna Gilbreath and Christina Jeong, from Defendant's Title IX office, that she was nervous about participating in a Title IX investigation because Ms. Bonnewitz wanted to play tennis and didn't want to have a target on her back.

54. Upon information and belief, Jeong reached out to the Women's Tennis team because she knew Ms. Bonnewitz wanted to play tennis.

55. Jeong assured Ms. Bonnewitz that she would not be retaliated against for participating in the investigation.

56. In an August 25, 2020 meeting with Jeremiah Dickey, Associate Vice President for Intercollegiate Athletics and Jovan Overshown, Senior Associate Athletics Director, Ms. Bonnewitz and her father asked Defendant to allow her to try out for the Women's Tennis team.

57. Defendant refused to allow Ms. Bonnewitz to try out for the Women's Tennis team stating there was no spot for Ms. Bonnewitz on the Women's Tennis team.

58. Ms. Bonnewitz asked if Defendant's refusal to allow her to try out was because of the Waco Tribune news article that came out about Boland texting Ms. Bonnewitz.

59. Baylor claimed that the decision had already been made prior to that; the situation with Boland did not involve them; and that they were not able to speak to that.
60. Ms. Bonnewitz complained that there had to be a spot because Men's Tennis had a roster of 15 student athletes and Women's Tennis only had a roster of ten student athletes.
61. Defendant responded that there was an imbalance between men and women playing sports and they had to rectify it.
62. Ms. Bonnewitz's father countered that that issue was usually due to too many men playing sports versus women.
63. Defendant then stated that they had a limit on the number of walks on they could have.
64. Ms. Bonnewitz further complained that the Equestrian team had about eight scholarship athletes and roughly 60 walk on athletes.
65. Defendant responded that it could not explain why 60 girls were on the Equestrian team and that it was empathetic to Ms. Bonnewitz's situation, but that the decision was made and they were not making changes to the Women's Tennis team.
66. After further discussion, Defendant stated that they could not add more athletes on the Women's Tennis team because of COVID.
67. Upon information and belief, Defendant's Athletic Department consulted with Defendant's Title IX Coordinator as well as Defendant's counsel regarding refusing to let Ms. Bonnewitz tryout prior to the August 25, 2020 meeting.
68. Upon further information and belief, following the August 25, 2020 meeting, Defendant added two female walk on tennis players to the Women's Tennis team, I.H. and S.V.

69. As a result of Defendant Baylor's actions, Ms. Bonnewitz lost the educational opportunity to play on the Women's Tennis team during her senior year or to at least try out for the team.

## CLAIMS FOR RELIEF

## COUNT I. TITLE IX RETALIATION

70. Plaintiff incorporates paragraphs 1-69 by reference.

71. Based on the foregoing, Defendant refused to allow Ms. Bonnewitz to try out for the Women's Tennis team in retaliation for Ms. Bonnewitz participating in an internal Title IX investigation and complaining about gender discrimination in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et.seq.*

72. As a result of Defendant Baylor's actions as described herein, Ms. Bonnewitz suffered emotional pain and humiliation and seeks monetary damages[1].

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF prays that this Honorable Court enter an order:

A) Declaring Defendant Baylor violated Plaintiff's rights under Title IX as set forth herein;

B) Granting Judgment in favor of Plaintiff on this count, including an award of damages as set forth herein, plus costs and attorneys' fees under 42 U.S.C. Section 1988, and other applicable statutes; and

C) Granting such other relief as this Court deems just and proper.

---

[1] Ms. Bonnewitz does not seek punitive damages under Count I as punitive damages are likely unavailable under Title IX in light of the Supreme Court's decision in *Barnes v. Gorman*, 536 U.S. 181, 122 (2002).

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a jury trial on all issues so triable in this action.

DATE:  May 12, 2021

Respectfully submitted by:

S/ Phillip N. Sanov
Phillip N. Sanov
TX Bar: 17635950
MORGAN & MORGAN, PA
16225 Park Ten Place, Suite 500
Houston, Texas 77084
T: 346-214-4324
M: 713-825-3444
psanov@forthepeople.com

Adria Lynn Silva*
Fl Bar: 0137431
MORGAN & MORGAN, PA
8151 Peters Road, 4th Floor
Plantation, Florida 33324
T:  954-327-5367
M: 239-271-2855
asilva@forthepeople.com
adrialynsilva@aol.com

Clay Martin Townsend*
Fl Bar: 0363375
MORGAN & MORGAN, P.A.
20 N. Orange Ave., Suite 1600
Orlando, Florida 32806
T: 407-418-2075
M: 407-719-9866
ctownsend@forthepeople.com

*Pro hac vice application to follow.